1185, Maria Lucia Garcia-Aguilar v. Eric H. Holder, Jr., Attorney General Thank you May it please the Court, I'd like to reserve three minutes for rebuttal? Yes Thank you, Your Honor. Your Honors, the decision below should be reversed, because Ms. Garcia's affidavit and testimony, which are uncontroverted by any other evidence in the record, establish at a minimum a prima facie case that the evidence used against her in her immigration proceeding was come at as a result of egregious violations of her constitutional rights, as well as violations of ICE's own regulations. Viewed in the light most favorable to Ms. Garcia, as it must be at this stage in the proceeding, the evidence shows that the ICE agents arrested Ms. Garcia without probable cause, subjected her to inhumane conditions of confinement, and interrogated her in an atmosphere of coercion, without even following their own regulations. The IJ's failure to grant the motion to suppress, or at a minimum to put the burden to the government to justify its treatment of Ms. Garcia, was therefore erroneous, as was the BIA's affirmance. Counsel, may I ask you kind of a threshold question for me? And that is, I will assume for the sake of argument here, I will assume that the behavior was egregious, so that on that Fourth Amendment standard of suppression, you got a case. So start with that assumption. My understanding is that you do not take the position that the immigration judge, and later the BIA, were without jurisdiction to hear the case. You're telling me they did the wrong thing when they heard it, but they had jurisdiction to hear it. That is correct, Your Honor. We are not contesting jurisdiction. Now, if they had jurisdiction to hear it, and your client testified, as the record indicates, and responded to a series of questions by a number of questions by invoking the Fifth Amendment, and if it is good law, as I understand it, that in a civil proceeding of this sort, invocation of the Fifth Amendment can be taken as evidence against the interest of the witness, why didn't the witness furnish sufficient evidence against herself simply by reason of her invocation of Fifth Amendment rights, so that the entire issue of whether the other evidence should have gone in or not is basically academic? Well, Your Honor, two responses to that. First, as a matter of the record, the adverse inference that the I.J. drew in this case, and this is clear from the I.J.'s decision, was not an adverse inference of alienage. The adverse inference that the I.J. drew in this case… I'm sorry, not an adverse inference of what? It was not an adverse inference that Ms. Garcia is an alien. The adverse inference that the I.J. drew was the inference that the birth certificate is an authentic document. But as we explained in our briefs, the authenticity of the birth certificate is not an issue here. The issue is whether the birth certificate is legally admissible in this case. And secondly, Your Honor, while it is true that it is permissible under this circuit's law to draw an adverse inference, it is not the law that an adverse inference alone in an immigration proceeding, without any other evidence of alienage, is sufficient for the government to carry its burden of demonstrating that the person is an alien. Well, why shouldn't it be? Well, Your Honor, this is explained succinctly in footnote 10 of the Pritz-Zanson case from the Second Circuit that we cite in our reply brief. In that footnote, the Second Circuit, citing the BIA's own precedent, held that silence alone cannot be enough to show alienage in an immigration proceeding. But this isn't silence. Well, the… She's saying, I'm taking the fifth. That's not silence. Well, but the rationale here, I think, is the same as the logic in the BIA cases cited in Pritz-Zanson. The regulations governing immigration proceedings are structured so that the government initially carries the burden of proving alienage before the burden shifts to the alien to justify a right to stay in the country. It would defeat the purpose of that regulation to allow the government to simply haul someone into immigration court in the absence of any other evidence in the record of alienage, and then put them on the stand and ask them, are you an alien, yes or no, and deport them for that reason. Furthermore, I think if you look at the facts of this case, given the egregiousness of the way in which ICE arrested and detained Ms. Garcia in the first place, I think that it would create a very, very dangerous precedent if it were the law that ICE could simply go and arrest someone without probable cause on the basis of some improper consideration such as their race, haul them into an immigration court, and then ask them on the stand, are you an alien, yes or no. So for all those reasons, we think that in the absence of any other evidence, and our contention is that there is no other legally admissible evidence of alienage in this case, even had the IJ drawn an adverse inference of alienage, which in this case he did not, that would not have been sufficient to meet the government's burden of demonstrating alienage. Counsel, can I ask you a, maybe it's more a practical question than a legal question. If you were to succeed in winning an order from us that this case has to be remanded and the statements of your client in the 213 form, the birth certificate, have got to be suppressed, and you pointed out that the government has the burden of proving alienage, what would that mean for possible future proceedings? I guess basically would the government be forever disabled from establishing your client's alienage so that there would be no possibility of future proceedings against her in circumstances where there seems little doubt that she was born elsewhere? What would happen in the future? Well, Your Honor, we would submit that in future proceedings in this current case, any evidence that was obtained as a result of the illegal arrest and detention, including the I213 and the birth certificate, would be inadmissible against her, and the government, maybe in this proceeding, would not be able to use any of that evidence against her in immigration court. Do you mean by that that the government, in effect, simply has to ignore indefinitely what in fact they know? Well, in theory... In other words, does she get sort of a pass as well as a reversal? Well, Your Honor, I wouldn't put it quite that way. I suppose in theory that at some point in the future, if by means completely independent of the violations at issue in this case, the government were to encounter Ms. Garcia again and had completely independent evidence, then maybe in that circumstance they might be able to initiate new proceedings against her. But I think as for this proceeding, Your Honor, it is the case that the government can't use the evidence. So you would take the position then that if you win a reversal here, the government could not, in fact, start another investigation into her alien status? Well, I think in theory, if they were to start that investigation based on evidence entirely divorced from the evidence they obtained here... No, but without a new cause to do it, the government, in effect, has to ignore her illegal status indefinitely. I think, as a practical matter, that probably is the case. And that is obviously a... And as the Supreme Court said in Lopez-Mendoza, that's not an outcome that we want in normal situations, which is why the suppression doctrine does not normally apply. But in the case of egregious constitutional violations, as the Supreme Court held in Lopez-Mendoza, and as this Court and other courts have found following Lopez-Mendoza, the balance between, on the one hand, ignoring a potential ongoing violation, and on the other hand, potentially condoning or at least failing to deter illegal government conduct, is such that in those situations of egregious constitutional violations, you should suppress the evidence, even if it might mean that someone who might actually be an alien is allowed to stay in the country. Now, accepting the premise, Your Honor, which we think is correct, that there were egregious violations in this case... Well, before we go there, could you just lay out for us what definition of egregious you want us to apply? I know it's in your brief, but you want us to apply the Third Circuit multifactor test or the Ninth Circuit test? How do you define egregious? Well, Your Honor, no court has ever articulated a specific bright-line rule. We think that if this Court were to apply the multifactor test articulated by the Third Circuit in Oliva-Ramos, and also to look at ICE agents' conduct throughout the totality of the arrest and detention, as the Second Circuit mentioned in Kotzege, when you look at that multifactor totality analysis, we think the facts that you see here and the combination of all these factors, including the unnecessary painful handcuffing, the transporting, the lack of adequate food and shelter from the cold for the first 24 hours, all of those factors combined under the multifactor test in Oliva-Ramos make this situation egregious, make the Fourth Amendment violations here egregious. And separately, Your Honor, we think that there's an independent ground to find the Fourth Amendment violations egregious, which is that the arrest was based on race. But the Court could find egregiousness of the Fourth Amendment violation on either of those two grounds. Counsel, the government also argues, as you know, that for yet another reason, perhaps, we should not reach the constitutional violation issues because of the government would say the independent way in which the birth certificate entered these proceedings. Now, maybe incorrectly, I've tended to think of the talking about the fruit of the poisonous tree doctrine, and that which you invoke, and I usually think of some way in which the government has exploited a prior illegality in obtaining evidence that it now seeks to use, and maybe that's wrong. But the government points out that there was no such exploitation here. Quite independently, the Mexican consulate sent this birth certificate to the government, and so under those – perhaps because of – obviously, I would say because of an awareness of what had happened, but they took it on their own initiative to send the birth certificate to the government. Why isn't that an independent source of this evidence of alienage, and hence not subject to the fruit of the poisonous tree doctrine? Well, Your Honor, it's not an independent source because one has to look at the government's role in creating the motivation for the Mexican consulate to send that fax. As the consulate's own fax makes clear, and as their amicus brief confirms, they would not have sent that fax to ICE had ICE not initially illegally arrested and detained Ms. Garcia. But that's essentially a but-for argument, and but-for fruit of the poisonous tree, they are not coextensive concepts, isn't that correct? You just can't say it but-for, hence fruit of the poisonous tree. That's clearly not right. Yes, Your Honor, that's entirely not correct, and that's not what we're arguing here. Our position is that there's significantly more than just but-for causation here. May I finish? May I answer, Your Honor? Yes. Our position is that there's significantly more than but-for causation here. This is not a case – and the government has never argued that this is the kind of case where the causal link between the arrest and the sending of the birth certificate was attenuated. And if one looks at cases where courts have found attenuation, one example is the case of the petitioner Wong Sun in the Wong Sun v. U.S. case. There, the petitioner – there he was arrested. He was released on his own recognizance. He then came back later and made what the Supreme Court found to be a totally voluntary statement. So in that circumstance, the court found that there was attenuation in merely but-for cause. We think that on the facts of this case, given what we know from the record and from the consulate's brief about why the consulate sent the birth certificate and the government's role in inducing that birth certificate to be sent, which is a factor that this court looked at in Finnegan, there is significantly more than but-for causation here and sufficient to meet the suppression test under Wong Sun. May I ask you a follow-up there? Going right to the analysis that you gave toward the end of your answer, I can understand – and I think this was perhaps part of Judge Lopez's question – I understand the fruit-of-the-poisonous-tree doctrine to apply in the very simple case in which the government, based on what it knows, having acquired that knowledge illegally, then takes a further step to uncover more evidence. Clear fruit-of-the-poisonous-tree analysis applies there. What I don't see as so clear is, as Judge Lopez said, a mere but-for-cause analysis. In other words, an analysis that would say it's fruit-of-the-poisonous-tree simply because the Mexican consulate would not have sent the birth certificate if this illegal conduct had not occurred. Your attempt, I think, to deflect that distinction was to say that the government in this case induced the consulate to provide the birth certificate by giving notice, presumably, that this particular person, this Mexican national, was in custody. Why, on this record, is it possible to conclude that they induced it? They were simply doing what the law required. They were notifying the consulate of Mexico that they had a Mexican citizen in custody. Right, wrong, or indifferent, they were required to do it. How is that – why should that be construed as an inducement by the government to make a third party provide the government with more evidence? Well, Your Honor, two things. First, just to be clear, we're not arguing if the government notified the consulate. I don't believe there's any evidence of that in the record. Well, if you're not making that argument, then it seems to me your argument for inducement evaporates completely. Well, respectfully, Your Honor, we don't think it does. We think that in this case, the step that the government took that created the inducement was the arrest and detention of Ms. Garcia. And as the consulate explains in their brief, in situations like this, it is a standard practice for the Mexican consulate and others to reach out to the government to try to arrange care for minors. Oh, I understand that. But an inducement is an intentional act. It's not but for causation. There is a distinction. And if you are claiming that there was no effort on the part of the NIU – in fact, you don't know how the Mexican consulate found out – then I don't think you can argue inducement. And I think you're back at the point at which the fruit-of-the-poisonous-tree doctrine is limited to make sure that it doesn't get confused with but for causation. Well, I guess two responses. First, as I said earlier, the government's position has not been that this is a mere but for causation case. The only position they've ever taken in this litigation is that there was no causal link because the Mexican consulate's actions were completely independent. Secondly, I mean, I recognize that this case is different on its facts from cases where the government has actively gone out and sought evidence after the initial illegality. But I think that if you look at the facts of this case – the third party was induced to do the act in place of the government, and therefore it should be construed as the government's act. But if you are not arguing that the government did the notification and so much as intentionally caused the furnishing of the birth certificate, then I don't see that you have an escape for mere but for causation. Well, Your Honor, we don't think that it's necessary for the government to have gone out and then taken some additional affirmative act to search for the birth certificate for the birth certificate to be subject to suppression. And I think if you look at the policies behind the independent source doctrine and the exclusionary rule, this case, even though it is admittedly a somewhat unique factual circumstance, falls comfortably within the orbit of situations where the independent source doctrine has been found not to apply. The point of the doctrine is that, as the Supreme Court explained in U.S. v. Murray, is that while the government should not be allowed to profit from its illegal activity, it should also not be placed in a worse position than it would otherwise be but for the illegal activity. In this case, Your Honor, there's been no argument from the government, and there's no evidence in the record that they were independently searching for the birth certificate and that they would have found the birth certificate independently of the arrest. And in addition, if you look at the potential for the government to profit, I mean, that's clearly what happened here. And I think that's demonstrated most starkly if one keeps in mind the procedural history of this case. This is the case in which we see a – We're going to reserve some time, Counsel. We'll hear from the government. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. John Blakely on behalf of the Respondent and Attorney General of the United States. Your Honors, I'd like to address the underlying premise behind a lot of the discussions so far this morning, and that is that there's been a prima facie evidence established of a violation or even more of an egregious violation, and I would reject that premise as a starting point. And as I do that, I would suggest that sometimes it's more important what somebody doesn't say as it is important to look at what they have said, and that's illustrated in this case. Now, what I'm talking about in particular there is that in page 442 of the record, that's the affidavit from the alien, for the first time, from Ms. Garcia, for the first time she says, this was the first time anyone mentioned anything to me about a legal process. Now, that sort of statement, talking about when she has the encounter actually at Fort Devens, she says that's the first time that happened, so that you know that's the first time anybody told her that she was going to be going into removal proceedings. When she's talking about any discussion of did they ask me questions about where I was from, there's no mention ever that that is the first time I was asked that question. In fact, if you look at her testimony, and this is on page 160 of the record, we have this statement from her in her testimony when she's talking about what happened to her on the bus, why she was waiting on the bus. This is, again, after she's been questioned inside the company, inside the factory, and then she's been taken out to the bus, and they're asking her why she was waiting on the bus. Counsel, I suspect this is a very curious place for you to begin. I mean, you've heard concerns from us about this independent issue, a possible assumption that there's an egregious violation here, yet you're starting to focus on that constitutional violation issue, and I must say in an odd way because isn't it clear from this record that she was almost immediately handcuffed without any questions being asked? There was no suggestion at that point that they had any reason to suspect her individually, other than perhaps her appearance. It was quite a long time before any questions were asked of her. In fact, she was transported, was she not, to Fort Devon again before any questions were asked. I mean, she was in custody, handcuffed for a long period of time before any questions were even asked of her. I mean, that seems to establish without question a constitutional violation. Now, you may argue that it's not egregious, but it strikes me as a very curious place for the government to begin its argument in defense of what happened here. Your Honor, that's because it's important to reject a factual statement that you just made there, and that is that she had never been questioned before. She never states that she had never been questioned before, and in fact she makes this statement when talking about why she was waiting on the bus. She was waiting on the bus so long because the others had their picture taken and their testimonies. She didn't say they were asked their name. She said their testimonies. She was waiting for the other aliens to have their testimonies. And so the question is, has she established prima facie evidence that she was not questioned sometime in the factory? I reject that this is prima facie evidence that she was not questioned during the factory. I think that she was questioned in the factory. I think the I.J. thought she was questioned in the factory. I think the board felt that way. She has not presented anything to suggest that she was not questioned in the factory. And so if she was questioned in the factory, we have no violation at all. Even if the question had been, wait, then we may have the question of whether it was egregious. The way in which this raid and the subsequent inquiries were made was in full compliance with the ICE's own regulations, that they proceeded as they should have immediately to advise their right to have an attorney, the subsequent proceedings that would follow, all of that. They fully complied with ICE's own regulations. There is no prima facie evidence that they failed to comply. Under the regulations, they should have reasonable suspicion to question. There's reasonable suspicion in this case. Then beyond that, they have to have reason to believe. Are you suggesting that she was not even handcuffed before some inquiries were made to give them reasonable suspicion that she may be an alien? Are you suggesting that they have not even established prima facie evidence of that kind of violation? Yes, I am, Your Honor. Exactly. Okay. She doesn't say that she was in question beforehand. I think we also have to understand the context in which this raid occurred. We're talking about 300 agents moving into a factory of at least 360 employees with an arrest warrant, with a search warrant, with the understanding that many, if not all of the employees of this factory were not working there legally, that were not here in the country legally. That was the premise of this raid. What do you do with the individualized suspicion requirement? There is no evidence that they had any individualized basis for picking her out individually, unless it may have been the color of her skin. Well, we do know she admits that she was afraid. I'm sorry, that she was what? That she was afraid and that she immediately tried to make a phone call. And was that observed by the officers? She was on a cell phone. Are you taking the position that the evidence of the cell phone provides an individualized basis for concluding that she was an illegal alien? Well, I think the appropriate question is at that point whether she could be questioned. Do they have reasonable suspicion? We don't know whether she was questioned or whether she wasn't. You're asking us to infer from silence that she was, and that is speculative. I'm asking you what evidence do you have that there was an individualized basis to single her out for custody? And the only thing that you've come up with is she was using a telephone. Your Honor, the officers came in knowing that most, if not all, of the employees of this factory were working there illegally. They knew that because they had an arrest warrant to arrest five different executives who worked there, and they were going to arrest them for employing illegal aliens in a large scale. That was the starting point. They then had permission to enter the premises. Then they had permission to question and observe the individuals that are in that factory. And she has not provided prima facie evidence that she was not questioned at all or sufficiently, that her behavior wasn't observed, whether she attempted to, you know, out of fear. Counsel, let me interrupt you. I mean, this is just pure speculation. I thought you were working up toward the following argument, that because the government had evidence that a substantial percentage of the people working in this factory were working there illegally, that therefore there was a probability that she would be covered by that, and that was enough for probable cause. I did not run across that argument in the briefs, and maybe that's not the argument you're making. In other words, I thought you were saying, look, when we got a warrant based on evidence that the overwhelming number of the people in that factory were illegal aliens, that gives us a sufficient probability to arrest any one particular person working in that factory. Are you making that argument? No, Your Honor, I'm not. I'm saying that that's reasonable suspicion to enter the factory and to question the individuals in that factory, and then based on the result of those questions, an arrest would be made or the person would be released. And there's nothing to suggest that that questioning didn't occur here. It's her requirement to establish prima facie evidence that she was never questioned about her place of birth. And as soon as she did, because the typical approach in this situation is they ask you, you know, do you have permission to work here or are you American? And then they say, no, I'm from, or where are you from? I'm from Mexico. Then do you have your papers? Maybe it's there, but I do not recall from the decisions of the IJ, of the BIA, the argument that you are now making. They seem, I think in light of the arguments that are being made, they go more to the issue of there was no egregious Fourth Amendment violation here. You seem to be arguing the proposition that there was no prima facie case made, that there was any constitutional violation, that, in fact, it was the kind of questioning that's required to establish an individualized basis for belief that somebody is in violation of the immigration law. Will we find that argument? Well, the board says there's no prima facie evidence. It says that the alien is required to follow matter of Barsanis. And the requirements of matter of Barsanis, the board decision that spells out the procedure here, which the procedure is that first the alien has to establish prima facie evidence with an affidavit. Then that has to be supported with testimony. If with a combination of testimony and the affidavit they establish a prima facie case, then the burden shifts to the government to prove the reasons for the arrest. And the board says they never reach that point in this case. I'd like to break this down just a little. You seem to be saying today that there was no Fourth Amendment violation or that she has not met her prima facie burden of establishing that there was a Fourth Amendment violation. Correct. Your briefing doesn't discuss that. It only discusses whether there was an egregious violation. Am I mistaken about that? Well, I agree that there's no egregious violation either, Your Honor. I'm saying that as a subset of there's no egregious violation, there's no violation at all. But your brief doesn't argue that. Then I'm happy to address the no egregious violation, Your Honor. There's nothing that shocks the conscience here. To shock the conscience here, they have to establish that this was based on only race or that it shocked the conscience or that there's something that affects the fundamental fairness of proceedings. And there's nothing here in the evidence of the record that shocks the conscience. How about the fact that she was held for 24 hours without being given any edible food or liquid? Your Honor, it was only eight hours, I think, that we're talking about as far as when the statement is taken from her. And during that time, she was provided a sandwich that was frozen and I think it was a bottle of water also that was frozen. Presumably that melted at some point. And so she was able to have something. But I think that we're looking at the totality of the circumstances. And she waited on a bus. She was with a group of 300 other people who had the same thing happening to them. And she was taken to Fort Devens and she was put in front of an officer. And we're not talking about a severe interrogation. We're talking about a 20-minute period of time when she was given papers, where she was asked a few questions. She never indicates that she was told that she was threatened or that she was coerced. She was just asked questions about where she was from. And she was told that she wasn't going to be sent immediately, that she had a chance to go before an immigration judge if she wanted to do that. There was nothing threatening or coercive in that period of time. We also have to recognize that this is a situation where the government took 361 individuals into custody at the same time. And that takes time to process that. And I think that it's also important about whether you're establishing that this is an egregious violation worthy of suppressing the evidence, that we have to look at what it is that we'd be asking the government to do. And that there's very little different that you could ask the government to or that would deter future misconduct from the government by telling the government that they have to take statements from each of the agents as they question each of the 360 individuals who are in this factory. And the burden that that would place on the government and on any removal proceedings, which removal proceedings, again, are proceedings which are expedited. They're streamlined. This isn't a criminal court. You don't have the same protections of a criminal court. So there's a higher standard there. You have to balance the costs, the social costs of suppressing this evidence against the gain that you'd have, which is deterring future misconduct here. Was there misconduct here? There's no prima facie evidence of that. But if there is, what they're saying is she wasn't asked in the factory. Instead, she was asked after she was moved to Fort Devens. So is there a social benefit so great in moving that questioning from Fort Devens to the actual factory that we should suppress and allow this individual to remain in the government or in the country when she doesn't have permission, that we should? You talk about a social benefit. I mean, the notion that there has to be an individualized inquiry before somebody is arrested, I mean, that's not a social benefit. That's a constitutional proposition, and that's the assertion that's being made here. And ICE's own regulations deal with these kind of large raid-type situations, and your own regulations make clear that even in those circumstances, there has to be this kind of individualized question and individualized determination before somebody is taken into custody. So I don't understand. Are you arguing that there is a larger justification for ignoring that basic constitutional requirement in these sort of wholesale raid situations? May I answer, Your Honor? Please. I'm suggesting that there's a balance that this Court must weigh between deterring the specific misconduct that's alleged in this case versus the social cost of an alternative mechanism, and to lengthen removal proceedings to require more of the arresting officers and to allow an individual to take advantage of a mistake from the government to allow them to continue their violation of the laws of this country, to balance their shifts against suppressing the evidence in this case. And I'd ask this Court to deny the petition for review. Thank you, Your Honor. Thank you, Your Honors. First, just to briefly correct the record here, everything the government is saying about when she might have been questioned is pure speculation not supported by the record. Ms. Garcia's affidavit at page 8441 of the record, paragraph 3, makes it clear. One of the male officers pointed to me and the other said, come over here. Then she was set apart and handcuffed, and then she was asked her name. That is the only evidence in the record of any questions that she was asked before being taken to Fort Devens. And at the prima facie case stage, we're required to take her affidavit as true. None of the speculation about what other questions she might have been asked is in the government's brief. It was never relied on below by the IJ or the BIA. Now, secondly, with respect to the length of time in which she was not given adequate food, again, the government contends it was only eight hours. But again, if we look at Ms. Garcia's affidavit, that's page 8443, paragraph 7 and 8. She was given inedible frozen food on the bus. She was taken to Fort Devens, given inedible frozen food again, and then the next morning was again given inedible frozen food. So there is at least on this evidence roughly 24 hours where they didn't even bother to give her basic edible food. And so we think that that's one reason why this isn't just a question of it being a mere mistake, as the government characterizes it. That's why this is an egregious violation of the Fourth Amendment. Now, with respect to this argument that they make that they'll be hamstrung, you know, if they feel hamstrung by the Constitution, that's not really a problem that I can address. And in fact, Your Honor, as the ACLU's brief makes clear, the Supreme Court has indicated what the acceptable procedure is in the workplace raid context. In INS v. Lopez-Mendoza, and then as this court later explained in the Lopez-Garriga case, cited at page 8 of the ACLU's brief, in a workplace raid context, what the government can permissibly do is come to a location. They're allowed to question people, but those people have to be free to disregard the questions, and they have to be free to leave. That's not what they did here. On the record we have here, they handcuffed her before asking her any questions. And even then, the only question they asked her at the factory was, what's her name, which isn't sufficient to give probable cause. Lastly, with respect to the deterrence rationale, I mean, we think this is a compelling case for deterrence and to supply the deterrence rationale, both with respect to the I-213 and to the birth certificate. If it was the law that the government could go into a place, arrest somebody without probable cause, create this kind of humanitarian situation where the consulate, through its standard procedure, comes forward to try to reunite a mother with her minor child, and the government could use all that evidence against the person in the immigration proceeding, that creates a constitutional violation that has no remedy, and we don't think that that violation should be sanctioned. Perfect timing. Thank you, Your Honor. Counsel. Excuse me. I'm sorry. It's a little bit anticlimactic, but I want to ask you a question if I could, please. This goes to an alternative remedy that you propose in your brief. Initially, you ask us to order suppression here. You have an alternative that you propose, which is, I gather, to find that the IJ and BIA were in error to conclude that there was not a prima facie case made of an that prima facie burden having been met, the government would be required to justify before the IJ and the BIA what they did here. Could you just decide to understand how that would play out and what you have in mind? Yes, Your Honor. So this court certainly could remand it. If the court were to find that there was a prima facie case, as we think it should, the case would be remanded, and the government would then have the burden of justifying its actions. We propose an outright grant of suppression as our initial remedy because at the earlier suppression hearing, ICE made it clear that they would not bring any of their agents in to testify. And if that's the case, if they're not going to be bringing their agents in to testify, we don't see how they could meet their burden to justify the legality of their actions. But you're absolutely right, Your Honor. I mean, in theory, this court could remand back to the IJ, have the IJ have a hearing in which the government has the burden, and then we would see based on that what evidence, if any, the government wanted to put forward, and we'd go from there. All right. Thank you. Thank you, Your Honor. I would like to try to make a point that's important. I've been before this court before. I can submit it in writing. I'll just state one simple sentence with permission of counsel. You can do one sentence. I ask the court to look at this. You better introduce yourself. My name is Harvey Kaplan, former immigration attorney, retired recently. I ask the court to look at this SIN case, S-I-N-T, which specifically stated that a birth certificate is not sufficient to meet the burden of proof of present alienation. Thank you. And the SIN case, I think, is very important.